STATE OF CONNECTICUT *v.* JOSEPH S. SMOLEN

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. MV 12-37020

Argued May 16—decided May 29, 1967

*Karl Fleischmann,* of Hartford, for the appellant (defendant).

*Eugene T. Kelly,* prosecuting attorney, for the appellee (state).

JACOBS, J. The defendant was convicted in a trial to the court of failure to carry registration certificate, in violation of § 14-13 (b) of the General Statutes,[1] and of failure to obey orders of an officer, in violation of § 14-223,[2] and he has appealed from the judgment.

The facts are substantially undisputed. On December 16, 1966, at about 9:30 p.m., two uniformed state police troopers were engaged in spot-checking all automobiles by means of a roadblock which was set up at the intersection of route 32 and Crow Hill Road, public highways, in the town of Stafford, for the purpose of checking safety equipment, registration certificates and operators' licenses. Early the next morning, on December 17, 1966, at about 12:20 a.m., a Mercury automobile

---

[1] "Sec. 14-13. REGISTRATION NUMBER AND CERTIFICATE. . . . (b) Such certificate shall at all times be carried . . . upon the public highway . . . ."

[2] "Sec. 14-223. DISOBEYING ORDERS OF OFFICER. Whenever the operator of any motor vehicle fails promptly to bring his motor vehicle to a full stop upon the signal of any officer in uniform or prominently displaying the badge of his office, or disobeys the direction of such officer with relation to the operation of his motor vehicle, he shall be fined not less than five nor more than twenty-five dollars for a first offense, and not less than ten nor more than fifty dollars for any subsequent offense."

operated by the defendant was proceeding in 'a southerly direction on route 32 when one of the state troopers waved him to come to a halt, but he attempted to pass the trooper without stopping. When the defendant did come to a stop, the trooper requested him to back his vehicle because it was blocking the highway. The defendant refused to remove his car from the traveled portion of the highway. He questioned the officers' right to stop him. In its corrected finding, the trial court found that the officers "had no reason to believe that the defendant had committed a crime when they stopped his car." At the request of the officer, the defendant produced a valid Connecticut operator's license; although the vehicle was properly registered under the laws of this state, the defendant failed to produce on request the certificate of registration. The defendant was thereupon given a uniform traffic ticket notifying him to appear in the Circuit Court on January 16, 1967, to answer to the foregoing violations. The defendant then continued on his way. He was not booked, nor was bond required of him.[3]

The basic issues involved in this appeal are (1) whether roadblock stopping of vehicles to check operators' licenses, certificates of registration, safety equipment and the like constitutes an arrest; (2) whether roadblock stopping of vehicles is constitutionally permissible as a valid exercise of the police power; and (3) whether roadblock stopping of vehicles constitutes an invasion of privacy.

I

Under Connecticut law, "[a]n arrest in criminal cases is the apprehending, or detaining the person

---

[3] We are justified in assuming some of these facts, although they do not appear in the finding, by reason of the fact that the defendant was given a uniform traffic ticket which was made a part of the record on appeal. See Practice Book §§ 852, 853.

in order to be forthcoming to answer an alleged or suspected crime." 2 Swift, Digest, p. 387; see *Ryan* v. *Ebecke,* 102 Conn. 12, 18; 6 C.J.S., Arrest, § 1 (b); 4 Wharton, Criminal Law and Procedure § 1581; 1 Orfield, Criminal Procedure under the Federal Rules § 4.4. In *Henry* v. *United States,* 361 U.S. 98, decided in 1959, the court said (p. 103): "The prosecution conceded below, and adheres to the concession here, that the arrest took place when the federal agents stopped the car. That is our view on the facts of this particular case. When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this case, was complete." See Sobel, Current Problems in the Law of Search and Seizure, p. 115. But we do not interpret the *Henry* case as standing for the proposition that every stopping of an automobile constitutes a technical arrest. In *Rios* v. *United States,* 364 U.S. 253, decided one year after *Henry,* the court left open the question whether the momentary halting of an automobile for investigation purposes automatically constitutes an arrest. And in *Brinegar* v. *United States,* 338 U.S. 160, Mr. Justice Jackson, a leading exponent of a citizen's fourth amendment rights, in a dissenting opinion said (p. 188): "I do not, of course, contend that officials may never stop a car on the highway without the halting being considered an arrest or a search. Regulations of traffic, identifications where proper, traffic census, quarantine regulations, and many other causes give occasion to stop cars in circumstances which do not imply arrest or charge of crime."

"To determine whether an arrest has taken place [in this case], we look to the facts to see if there has been 'an actual restraint of the person.'" Foote, "The Fourth Amendment: Obstacle or Necessity in the Law of Arrest?" 51 J. Crim. L.C. & P.S. 402,

403.  "To constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained." *Jenkins* v. *United States,* 161 F.2d 99, 101.  The stopping of the defendant's car in this case cannot be considered as an arrest.  No intent to apprehend the defendant was shown and no move was made to take him into custody at the time.  The officers did not open the car door when it was stopped, nor state that the defendant was under arrest, nor touch his person.  See *Gilliam* v. *United States,* 189 F.2d 321, 323; Perkins, "The Law of Arrest," 25 Iowa L. Rev. 201; Restatement (Second), 1 Torts § 112, comment c.  "It is settled law that peace officers have the unquestioned right to detain one driving an automobile for the purpose of examining his driver's license.  Such a detention is not unlawful where it is done in good faith for that specific purpose.  But when it is a mere subterfuge, 'or an excuse for a failure to procure a . . . warrant,' it is unlawful." *Murphy* v. *State,* 194 Tenn. 698, 701.

We hold that the stopping of the defendant's car under the particular circumstances of this case was not an arrest.  See *Lipton* v. *United States,* 348 F.2d 591, 593; *Busby* v. *United States,* 296 F.2d 328, 332, cert. denied, 369 U.S. 876; *United States* v. *Bonanno,* 180 F. Sup. 71, 79; *Barrier* v. *Alexander,* 100 Cal. App. 2d 497, 500; *People* v. *Yerman,* 138 Misc. 272 (N.Y.); *Toledo* v. *Lowenberg,* 99 Ohio App. 165, 167; 1 Orfield, Criminal Procedure under the Federal Rules § 4.66, p. 193; see also *State* v. *Amara,* 152 Conn. 296.

## II

Under § 14-217, any officer in uniform is given the authority to require any person who is operating or who is in charge of any motor vehicle to

produce on demand his motor vehicle registration certificate and operator's license.[4]  And for the safety of the public, every operator is required to obtain an operator's license (§ 14-36), which he "shall carry . . . while operating such vehicle." § 14-213.  Furthermore, all vehicles must be registered in compliance with § 14-13 (a), and "[s]uch certificate shall at all times be carried upon such motor vehicle when upon the public highway." § 14-13 (b).  "The operation of a motor vehicle upon the public highways is not an absolute right, but only a privilege which the state may grant or withhold at pleasure in the course of its regulation and control of public ways."  7 Am. Jur. 2d 601, Automobiles and Highway Traffic, § 6.  Our courts have consistently held that "[a]n operator's license is purely a personal privilege, nontransferable and granted by the State on account of fitness. . . . The registration certificate is for purpose of identification and revenue."  *Shea* v. *Corbett,* 97 Conn. 141, 145; *Dempsey* v. *Tynan,* 143 Conn. 202, 206; *Dentamaro* v. *Motor Vehicles Commissioner,* 20 Conn. Sup. 205, 208; 60 C.J.S., Motor Vehicles, § 60.  In addition to these regulations, the commissioner of motor vehicles is empowered by law to refuse to register any motor vehicle which is not equipped with lighting devices as prescribed by law. § 14-12.  He may require as a condition precedent compliance with the provisions of the law governing such equipment for the "protection of other users of the highway."  *Gonchar* v. *Kelson,* 114 Conn. 262, 265.  "State legislatures may, in the exercise of their police and revenue powers, enact reasonable regulations requiring the licensing or

---

[4] Section 14-217 is commonly referred to as the "display" statute. "Virtually every state has provided by statute that a motorist must carry his operator's license with him at all times while operating a motor vehicle, and display it upon the demand of a police officer." Note, 1960 Wash. U.L.Q. 279.

registration of motor vehicles, the prime purpose of vehicle registration laws being to supervise vehicles, their movement and control, and to establish their identity in relation to the public and to any resultant damage or injury they may occasion; in this way proper supervisory authority may be invoked when it becomes necessary to verify the owner of the vehicle." 7 Am. Jur. 2d 633, Automobiles and Highway Traffic, § 50. The underlying purpose of the provisions of our motor vehicle laws is to establish throughout the state a uniform system.

There can be little doubt that "[t]he death rate from motor accidents rivals that of our severest wars."[5] *Brinegar* v. *State,* 97 Okla. Cr. 299, 308. "Increase of highway casualties is one of the most impelling social questions now confronting the public. Civic bodies and law enforcement officers at every level are bending their efforts to reduce them." *Thornhill* v. *Kirkman,* 62 So. 2d 740, 742 (Fla.). In the light of such a compelling social problem, Professor Landynski asks: "Is there any situation short of probable cause which would justify a policeman in stopping an automobile? There is no doubt that he may do so for the purpose of enforcing the traffic laws, as, for example, the checking of drivers' licenses. One who drives an automobile does so subject to certain regulations made in the interest of community safety, and these would be meaningless if they could not be enforced." Landynski, Search and Seizure and the Supreme Court, p. 97. "It has been held that police officials may set up highway roadblocks for the purpose of requiring motorists to display their driver's license,

---

[5] We may take notice of the toll of automobile highway accidents in Connecticut in 1966. The statistics as furnished by the commissioner of motor vehicles show: number of deaths, 406; number of people injured, 33,243; number of accidents, 63,941; estimated property damage, $25,000,000.

and that such a practice does not invade their right to use the public ways free from unreasonable and unwarranted interception." 7 Am. Jur. 2d 669, Automobiles and Highway Traffic, § 98. Other jurisdictions have sustained roadblock stopping of vehicles under similar circumstances. See *Mincy* v. *District of Columbia,* 218 A.2d 507 (D.C. Ct. App.); *Miami* v. *Aronovitz,* 114 So. 2d 784 (Fla.); *Commonwealth* v. *Mitchell,* 355 S.W.2d 686 (Ky.); *Morgan* v. *Heidelberg,* 246 Miss. 481; Fisher, Vehicle Traffic Law, pp. 375–77. Even Professor Reich, an eminent and distinguished authority in the field of civil liberties, conceded that "violations such as lack of a valid license, defective equipment and even drinking are hard to detect without spot checks." Reich, "Police Questioning of Law Abiding Citizens," 75 Yale L.J. 1161, 1167; see notes, 51 Cal. L. Rev. 907; 46 Iowa L. Rev. 802; 1960 Wash. U.L.Q. 279, 281; 6 Wayne L. Rev. 417. Since the preservation and safety of users of our public highways are a matter of vital public concern and an appropriate subject for the exercise of the police power of the state, we hold that roadblock stopping of vehicles for the purpose set forth herein is constitutionally permissible as a valid exercise of that power where the stopping is done in good faith and is not used as a mere subterfuge or pretext, or as an excuse for failure to procure a warrant. There is nothing in the record before us to suggest or indicate that the spot check here was made for ulterior purposes.

### III

As to the defendant's claim of invasion of his right of privacy, we can do no more than rely upon and adopt the rationale of *People* v. *Fidler,* 280 App. Div. 698 (N.Y.). In that case, the police told the drivers of Fidler's heavily-loaded trucks to drive them on a portable scale. The drivers refused. They took the keys out of the ignition switches and

locked some of the doors of the cabs. They refused to turn the keys over to the police on request. The owner Fidler, who came in response to a telephone call, was requested to turn over the keys so that the trucks could be weighed; he refused to do this or to direct his drivers to turn over the keys or to drive the trucks on the scale. Fidler and his drivers were arrested for and convicted of resisting a public officer in the discharge of his duty. The Appellate Division of the Supreme Court of New York, in sustaining the conviction, said (p. 700): "There would seem to exist a difference in operative constitutional principle between the right of the State to authorize the police to 'inspect' a man's house or his person and its right to authorize the police to 'inspect' his automobile as to its operation, though the legal effect of 'inspect' in this sense is scarcely distinguishable from 'search.' When the State provides a public facility for private use and the use is by mechanical equipment, dangerous if defective, the right of public authority to examine the equipment as an incident to such a use would seem incontestable. A rule of law must be adaptable to important changes in the way people live and act, or collapse under the weight of need and be replaced by something else. The cloak of the right to privacy extends generally to an automobile; but it does not protect the driver against an inspection to determine if there is immediate danger in the very thing which the citizen has placed in present operation on the public way. A defective vehicle on a teeming traffic lane may require instant intervention of public power and that kind of intervention on the highway is not an invasion of privacy in truth or in the sense in which the draftsmen of constitutional language had of the protection they were affording against unreasonable searches." See *Commonwealth* v. *Abell*, 275 Ky. 802.

It should be emphasized that the defendant here, in common with other citizens, was intercepted on a public highway by uniformed state police officers who were making a systematic check of all drivers' licenses and registrations. The defendant does not claim, and there is nothing in the record to show, that he was subjected to any other type of search or seizure. "[T]he interests of the individual here must give way to the public interest." 1 Harper & James, Torts § 9.7, p. 686. In our view of this case, we find that no constitutional right of the defendant was invaded.

## IV

In summary, therefore, we hold: (1) An operator's license is a privilege granted by the state, not a right, and the operator accepts the privilege subject to reasonable restrictions; (2) the right to use the public highways is subject to reasonable regulation for the public welfare; (3) roadblock stopping of vehicles for the purposes enumerated herein was reasonable and necessary and a valid exercise of the police power; (4) there was no showing of subterfuge to question the good faith of the officers; and (5) no constitutional right of the defendant was invaded.

There is no error.

In this opinion PRUYN and LEVINE, Js., concurred.