519 A.2d 984

**COMMONWEALTH of Pennsylvania**

v.

**Stephen P. LENINSKY, Appellant.**

Superior Court of Pennsylvania.

Argued May 20, 1986.

Filed Dec. 29, 1986.

50

Arnold H. Cantor, Pittsburgh, for appellant.

Paul H. Millin, District Attorney, Tionesta, for appellee.

Before BROSKY, KELLY and ROBERTS, JJ.

KELLY, Judge:

This appeal raises the question of whether a police checkpoint or roadblock set up for the purpose of checking licenses, registrations, inspection violations, or for drivers under the influence of alcohol violates state or federal proscriptions against unreasonable searches and seizures.

In *Commonwealth v. Tarbert,* 348 Pa.Super. 306, 502 A.2d 221 (1986) (allocatur granted August 20, 1986), President Judge Cirillo opined for a divided panel of this Court that all such roadblocks or checkpoint stops are *per se* unconstitutional under Article I, Section 8 of the Pennsylvania Constitution. Therefore, the order and judgment of sentence is vacated and the trial court is directed to discharge the appellant.

Although I believe the *Tarbert* reasoning is factually and legally flawed, nonetheless, I would find that the procedures utilized in the instant case were constitutionally infirm. Consequently, I agree with the result reached by application of the *Tarbert* rule. I set forth my reasoning and concerns at length.

### FACTS

On March 1, 1985, three officers of the Pennsylvania State Police conducted a traffic check on Route 62 in Tionesta Borough, Forest County, Pennsylvania. All vehicles traveling in either direction were stopped and the operators were asked to produce their licenses and vehicle registration cards. The field officers were acting pursuant to the instructions of the station commander that a two hour safety check should be held once a week, weather

permitting. The date, time, site, and actual duration of the safety check were left to the discretion of the ranking field officer. There were no written guidelines or regulations for the traffic check, nor does the record indicate that specific instructions regarding the operation of the traffic check were given to the field officers by supervisory personnel.

Trooper Daniel Molitoris testified that he and two other uniformed officers of the Pennsylvania State Police selected a location, pulled their cars to the side of the highway and flagged down all cars traveling in either direction. The record does not include any evidence regarding the volume of traffic, safety precautions taken, notice to the public, or advance warning to the motorists approaching the traffic check.

Appellant, Stephen P. Leninsky, passed through the traffic check at approximately 1:00 p.m. Appellant failed to produce a driver's license when requested to do so. A subsequent check with the Department of Motor Vehicles revealed that appellant's driver's license was under suspension. The appellant was charged with Driving Under Suspension, D.U.I. Related, in violation of 75 Pa.C.S.A. § 1543(b).

On May 2, 1985, appellant was found guilty by the District Magistrate, fined one thousand nineteen dollars and fifty cents ($1,019.50), and sentenced to ninety (90) days imprisonment. Notice of appeal from the summary criminal conviction was filed on May 28, 1985. A hearing *de novo* was conducted before the Honorable Robert L. Wolfe on July 15, 1985. On August 14, 1985, the appeal was dismissed. On August 20, 1985, appellant filed post-trial motions. These motions were argued and denied on September 23, 1985. This appeal followed.

Appellant contends that the trial court erred in failing to dismiss the charges because: 1) the stop was in violation of the appellant's rights under the Fourth Amendment of the U.S. Constitution; 2) the stop was in violation of the appellant's rights under Article 1, Section 8 of the Pennsylvania

Constitution; and 3) the stop was invalid because under the Vehicle Code the officer did not have authority to stop appellant's vehicle.

## I.

■ Both the United States and Pennsylvania Constitutions protect citizens from unreasonable searches and seizures. U.S. Const. Amend. 4; Pa. Const. Art. 1, Section 8. I note that while federal law establishes the minimum constitutional protections applicable to all citizens, "the state has power to impose standards on searches and seizures higher than those required by the Federal Constitution." *Commonwealth v. DeJohn*, 486 Pa. 32, 43, 403 A.2d 1283, 1288 (1979), *citing Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

■ The protections of the state and federal constitutions apply where a police office stops a vehicle, thereby seizing both the vehicle and its occupants for the duration of the detention. *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Commonwealth v. Pollard*, 450 Pa. 138, 299 A.2d 233 (1973). However, "one's expectation of privacy in an automobile and freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976); *see also Commonwealth v. Shaffer*, 447 Pa. 91, 103, 288 A.2d 727, 734 (1972). "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects." *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1984). "Automobiles, unlike homes, are subject to pervasive and continuing, governmental regulation and controls, including periodic inspection and licensing requirements." *South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). Nonetheless, "[a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because

the automobile and its use are subject to government regulation." *Delaware v. Prouse*, 440 U.S. 648, 662, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979).

"The essence of the Fourth Amendment to the federal constitution, and Article I, Section 8, of the Pennsylvania Constitution, is reasonableness; these provisions provide protection against *unreasonable* searches and seizures." *In re Gartley*, 341 Pa.Super. 350, 361, 491 A.2d 851, 857 (1985) (emphasis supplied); *see also Zurcher v. Stanford Dailey*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *Commonwealth v. Tann*, 500 Pa. 593, 459 A.2d 322 (1983).

In *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973), our Supreme Court explained that, "there is no ready made test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entail." 453 Pa. at 111, 307 A.2d at 878, *quoting Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). In *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the United States Supreme Court stated:

Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.... A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to *arbitrary invasions solely at the unfettered discretion of officers in the field.*

433 U.S. at 50–51, 99 S.Ct. at 2640. (Emphasis added).

## II.

In *Commonwealth v. Tarbert, supra,* President Judge Cirillo opined for a divided panel of this Court that:

We hold that roadblocks, which without probable cause or a reasonable suspicion that a crime has been or is being committed, stop all vehicles travelling on a public high-

way for the purposes of checking licenses, registrations, inspection violations, and for drivers operating vehicles under the influence of alcohol are so violative of our citizen's rights that they must be declared unconstitutional.

348 Pa.Superior Ct. at 316, 502 A.2d at 226. The majority stated, without elaboration, that the decision was based on "bona fide, separate, adequate, and independent state grounds." 348 Pa.Superior Ct. at 309, 502 A.2d at 222.[1] The majority reasoned:

In *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973), the Court held that in order to stop a single vehicle to check compliance with the Motor Vehicle Code, a police officer 'must have probable cause based on specific facts which indicate to him either the vehicle or the driver are in violation of the code.' We can find no compelling reason to deviate from this rule in situations involving a systematic stopping of vehicles.

348 Pa.Superior Ct. at 313, 502 A.2d at 224–225 (citations omitted). I, on the other hand, find compelling reasons *not* to apply the rule announced in *Swanger* to cases involving systematic, non-discriminatory, nonarbitrary roadblocks.

First, our Supreme Court in *Commonwealth v. Swanger*, *supra*, emphasized that its opinion "should not be read as applicable to systematic stops or roadblocks for detection of Motor Vehicle Code violations." 453 Pa. at 110 & n. 3, 307 A.2d at 877 & n. 3. Secondly, the Court expressly distinguished the random seizure in *Swanger* from the searches in *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) and *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), stating:

---

1. Judge Wickersham stated in his Dissenting Opinion that:
   I would recognize the validity of non-discriminatory, non-arbitrary roadblocks. *See Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). I read nothing in the Pennsylvania Constitution that calls for a different interpretation than that espoused by our United States Supreme Court in the above cited cases.
   348 Pa.Superior Ct. at 317, 502 A.2d at 226 (parallel citations omitted).

In *See*, the 'search' was part of a routine, periodic city-wide canvas of commercial buildings, and in *Camara* the 'search' was part of an annual inspection of dwelling houses. These situations lack the arbitrariness inherent in the present case. The 'searches' in *See* and *Camara* were part of a systematic plan, whereas, the seizure here lacked any semblance of being part of a systematic plan.

453 Pa. at 114, 307 A.2d at 879 (footnote omitted). The absence of "absolute, unreviewable discretion and authority"[2] distinguishes roadblocks and checkpoint stops from the random traffic stop which *Swanger* declared unconstitutional.

### III.

▇ Although the state may impose a higher standard of reasonableness than mandated by federal law, *DeJohn, supra,* the test is similar under both the state and federal constitutions; we must balance the governmental interests served by the seizure, the effectiveness of the seizure in serving the governmental interest, and the severity of the intrusion on personal liberty caused by the seizure. *See Brown v. Texas, supra; Commonwealth v. Swanger, supra.*

### A. GOVERNMENTAL INTEREST

1) *License and Registration*

The Commonwealth of Pennsylvania has a vital interest in ensuring that only those qualified are permitted to operate motor vehicles, and that their vehicles are fit for safe operation. Hence, license, registration, inspection, and proof of financial responsibility requirements protect and enforce the state's compelling interest in maintaining appropriate highway safety standards. *Delaware v. Prouse,* 440 U.S. at 658–659, 99 S.Ct. at 1398–99. *See also Maurer v. Boardman,* 336 Pa. 17, 7 A.2d 466 (1938), *aff'd* 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969 (1939) (affirming states' right to regulate public highways).

2. *Swanger,* 453 Pa. at 113, 307 A.2d at 878.

## 2) *Drunk Driving*

The Commonwealth also has a vital interest in deterring, identifying, and removing drunk drivers from our highways; they present a threat to other motorists, pedestrians, and themselves. "The carnage caused by drunk drivers is well documented and needs no detailed recitation here." *South Dakota v. Neville,* 459 U.S. 553, 558, 103 S.Ct. 916, 919, 74 L.Ed.2d 748 (1983). "The slaughter on the highways of our Nation exceeds the death toll of all our wars." *Perez v. Cambell,* 402 U.S. 637, 657, 91 S.Ct. 1704, 1715, 29 L.Ed.2d 233 (1971) (Blackmun, J., concurring). In the past decade, over 250,000 people have died in alcohol related accidents. Each year, 708,000 people are injured, 74,000 seriously. Estimates of the economic loss caused by the drunken driver range from 21 to 24 billion dollars per year.[3] In 1981, 950 people were killed in alcohol related accidents on Pennsylvania highways. From 1972 to 1981, the number of alcohol related fatal accidents in Pennsylvania increased 154%.[4] It would be feckless to argue that the Commonwealth's interest in ending this carnage is less than paramount.

## B. EFFECTIVENESS

Next we must consider the effectiveness of checkpoints and roadblocks in promoting those governmental interests. In *Commonwealth v. Tarbert, supra,* the majority opined:

... we cannot sanction 'random seizures' based on 'luck and hunch' alone ... which inconvenience citizens without any justification of substance.' *State v. Kirk,* 202 N.J. Super. 28, 58, 493 A.2d 1271, 1288 (1985) (citations omitted). In short, systematic and random roadblocks are

**3.** *See* H.R.Rep. No. 867, 97th Cong., 2d Sess. 7 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 3367; *Federal Legislation to Combat Drunk Driving,* Hearing on S.671, S.672, S.2158 Before the Subcomm. on Surface Transp. of the Senate Comm. on Commerce, Science & Transportation, 97th Cong., 2d Sess. 65 (1982); Fell, J., *Alcohol Involvement in Traffic Accidents,* (May 1982); NHTSA, *Fatal Accident Reporting System 1980 Report* (October 1981).

**4.** *Governor's DUI Task Force Report* (October 14, 1982 Harrisburg, PA); *The New Pennsylvania Drunk Driving Law,* 87 DICKINSON L.REV. 805, 805 (1983).

nothing more than fishing expeditions which 'constitute police seizures and detention in the absence of the faintest scintilla of criminal wrongdoing.' Rodgers, [*The Drunk Driving Roadblock: Random Seizures or Minimal Intrusion?*, 21 CRIM.L.BULL. 197, 214 (1985)].

348 Pa.Superior Ct. at 314, 502 A.2d at 225. However, the weight of authority contradicts this assessment of the effectiveness of checkpoints and roadblocks.

1) *License and Registration*

In *Martinez-Fuerte, supra,* the Supreme Court stated: Stops for questioning, not dissimilar to those involved here, are widely used at state and local levels to enforce laws regarding driver's licenses, safety requirements, weight limits and similar matters ... this practice of stopping automobiles briefly for questioning *has a long history evidencing its utility,* and is accepted by motorists as incident to highway use.

428 U.S. at 560 n. 14, 96 S.Ct. at 3084 n. 14. (Emphasis added).

Although the Supreme Court later declared *random* stops of *individual* vehicles unconstitutional, it explained that states were free to develop "methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion." *Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401. The Supreme Court went on to suggest that "[q]uestioning all oncoming traffic at a roadblock-type stop is one possible alternative." *Id.* In *Texas v. Brown, supra,* the Supreme Court held that the appellant's initial stop at a routine driver's license checkpoint was valid. 460 U.S. at 739, 103 S.Ct. at 1541.

The facts of the instant case amply demonstrate the need for spot check procedures. The appellant's driver's license was suspended for Driving While Intoxicated. In spite of the severe penalties mandated for Driving While Under Suspension, D.U.I. Related (75 Pa.C.S.A. § 1543(b)), the appellant elected to continue driving. Because Driving While Under Suspension is a status offense rather than an observable act offense, it is not detectable by traditional,

less intrusive means. Without both an actual and a perceived risk of detection, license suspensions become a toothless sanction regardless of the penalties mandated upon conviction.[5] On the other hand, checkpoint and roadblock spot checks can provide an effective deterrent and detection mechanism, while at the same time removing the unbridled discretion of random traffic stops.

License and registration checkpoints also help to combat the menace of drunk driving. During a motorist's brief detention at the checkpoint, trained officers are placed in a position to legally observe drivers and check for signs of intoxication.[6] Once the vehicle is legally stopped, there is "no legitimate expectation of privacy, ..., shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either an inquisitive passerby or diligent police officers." *Texas v. Brown*, 460 U.S. at 740, 103 S.Ct. at 1542; *see also New York v. Class*, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). If the officer observes signs or symptoms of intoxication, he may properly detain the suspect for performance of appropriate behavioral or coordination tests. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

## 2) *Drunk Driving*

"One of the most effective methods of detection and deterrence of drunk drivers is the DWI roadblock or 'sobrie-

---

**5.** This reasoning is equally applicable to enforcement of 75 Pa.C.S.A. §§ 1101, 1301, 1311, 1371, 1372, 1374, 1375, 1501, 1505, 1511, 1512, 1514, 1532, 1533, 1539, 1540, 1542, 1543, 1547(b), 1573, 1574, 1772, 1773, 4703, 7101, and 7102. I note that violation of 75 Pa.C.S.A. § 3731(a)(4) is also a status offense. At or near the legal limit, an intoxicated driver may not feel or appear intoxicated. Nonetheless, scientific research has established that such drivers are dangerous; and the General Assembly has decreed that a .10 BAC level is sufficient to support conviction.

**6.** While many things can provide an experienced officer with grounds to suspect that a driver may be intoxicated, I would take judicial notice of the following symptoms or signs of alcohol intoxication: 1) odor of breath; 2) flushed appearance; 3) lack of muscular coordination; 4) speech difficulties; 5) disorderly or unusual conduct; 6) mental or visual difficulties; 7) sleepiness; 8) dizziness; and 9) nausea.

ty checkpoint.'" J.W. Hall, Jr., *Search and Seizure*, § 10:31.1 at 361 (Cum.Supp.1986). Sobriety checkpoints differ from license and registration checkpoints in that the deterrence, detection and removal of drunk drivers is the primary rather than secondary purpose of the stop. Additionally, they differ in that the justification of the sobriety checkpoint rests on the Commonwealth's specific interest in deterring, detecting and removing drunk drivers from Pennsylvania highways rather than general interests in highway safety.

Sobriety checkpoints serve the public interest in two ways: 1) they serve as a deterrent to potential drunk drivers by increasing the actual and perceived risk of detection; and 2) they aid in apprehending and removing drunk drivers from the road. Use of sobriety checkpoints and roadblocks for these purposes is recommended by the National Highway Traffic Safety Administration (NHTSA), the Presidential Commission on Drunk Driving, the International Association of Chiefs of Police, and the National Transportation Safety Board (NTSB).[7]

A 1984 safety study by the National Transportation Safety Board indicated that without sobriety checkpoint programs, many alcohol impaired drivers believe they can avoid police detection by driving carefully. However, with the use of sobriety checkpoints, the general public's perception of the probability of detection and sanction is increased.[8] I note that the public perception has a strong basis in fact. While those drunk drivers arrested by roving patrols average a .169 to .20 blood alcohol content (BAC) level, drunk drivers arrested at Delaware sobriety checkpoints averaged a .14 BAC level. In light of the fact that a driver with a .10

7. NTSB, *Deterrence of Drunk Driving: the Role of Sobriety Checkpoints and Administrative License Revocations*, at 20–21, 31 (Washington, D.C. April 3, 1984); NHTSA, *The Use of Safety Checkpoints for DWI Enforcement*, at 1–2 (Washington, D.C. September 1983); NHTSA, *Dealing With Drinking Drivers: Guidelines for Motor Vehicle Administrators*, at 89 (Washington, D.C.1986).

8. NTSB, *Deterrence of Drunk Driving, supra*, at 9, *citing* A. William, *et al., Deterrent Effects of Roadblocks on Drinking and Driving*, Insurance Institute for Highway Safety (Washington, D.C.1984).

BAC level has a six times greater likelihood of causing an accident than a sober driver, the effectiveness of sobriety checkpoints in detecting and removing drunk drivers with *dangerous* but significantly lower BAC levels is significant.[9]

Furthermore, studies in Maryland and Delaware have indicated that the uses of sobriety checkpoints have led to significant decreases in alcohol related accidents, injuries, and fatalities.[10] Longer and more comprehensive studies of the effect of sobriety checkpoints programs in Australia, France, Canada, and Sweden indicate that: 1) public perception of the risk of arrest increased; 2) the percentage of drivers with illegal BAC levels decreased; and 3) alcohol related accidents, injuries and fatalities decreased.[11]

It is important to note that traditional roving patrols searching for observably impaired drivers and sobriety checkpoints are not competing or mutually exclusive alternatives. To the contrary, the National Transportation Safety Board and other organizations urging the use of sobriety checkpoints emphasize that they are efficient and effective only when used in conjunction with existing efforts as part of a comprehensive program of education, deterrence, interdiction and sanction.[12]

## C. DEGREE OF INTRUSION

In *Commonwealth v. Tarbert, supra,* the majority reasoned that the "intrusion upon the individual in systematic

9. *See State v. Stroman, Nos. IN83–02–0055T, N83–04–0132T, and N83–09–0620T, Slip Opinion* at 8 n. 4 (Del.Super.Ct.1984); Borkstein, R., *Problems in Enforcement, Adjudication, and Sanctioning,* at 655–662 (1983); *see generally Alcohol Drugs and Driving: Hearing to Examine What Effect Alcohol & Drugs Have on Individuals While Driving,* Before the Subcomm. on Alcoholism & Drug Abuse of Senate Comm. on Labor & Human Resources, 97th Cong., 2d Sess. 1 (1982).

10. Traffic Control Section, *DUI Monthly Report,* Del. State Police (Aug. 1983); Field Operations Bureau, *Sobriety Checkpoint Program Evaluation Report,* Md. State Police, Traffic Planning Unit (April 20, 1983).

11. NTSB, *Deterrence of Drunk Driving, supra* at 7–8 & nn. 12–18 (citing reports).

12. *Id.,* at 2.

stops is no less an intrusion because of the mere fact that all vehicles traveling on the highway are stopped." 348 Pa.Superior Ct. at 314, 502 A.2d at 225. Again, I cannot agree. To the contrary, "[t]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving patrol stop. Roving patrols often operate at night on seldom traveled roads, and their approach may frighten motorists. At traffic checkpoints, the motorist can see that other vehicles are being stopped, he can see visible signs of the officer's authority, and he is much less likely to be frightened or annoyed by the intrusion." *United States v. Ortiz*, 422 U.S. 891, 894–895, 95 S.Ct. 2585, 2587–88, 45 L.Ed.2d 623 (1975).[13] Moreover, the "regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that stops are duly authorized and believed to serve the public interest." *Martinez-Fuerte, supra*, 428 U.S. at 559, 96 S.Ct. at 3083.[14]

## IV.

Based upon the foregoing, I conclude that governmental interests in licensing, registration, and highway safety in general, and specifically in deterring, detecting, and removing drunk drivers from Pennsylvania highways are vital and compelling. Traditional methods are inadequate to protect those interests. Checkpoints and roadblocks have been proven to be effective tools in protecting those interests when used as part of a comprehensive highway safety program. Consequently, I question the reasoning of the majority in *Tarbert. See Tarbert*, 348 Pa.Superior Ct. at

**13.** This observation is supported by the results of surveys conducted in conjunction with sobriety checkpoints in Delaware, Maryland, and Washington, D.C. which revealed that motorists stopped at such checkpoints overwhelmingly supported continued use of sobriety checkpoints (Delaware 87.5%, Maryland 86%, and Washington, D.C. 88%). *See* NTSB, *Deterrence of Drunk Driving, supra,* at 9–10.

**14.** I note that the degree of intrusion in a sobriety check is no greater than that present in a license check. Drivers are stopped in the same manner and detained for the same amount of time. That either stop may give rise to reasonable suspicion or probable cause to support further detention does not alter the intrusiveness of the initial stop.

314, 502 A.2d at 225 (Wickersham, J., dissenting); *Wysocki v. Dept. of Transportation,* 91 Pa.Cmwlth. 42, 45–46, 496 A.2d 897, 899 (1985) (allocatur granted) (stop at license and registration check met standards in *Prouse,* license suspension under 75 Pa.C.S.A. § 1547(b) affirmed); *Commonwealth v. Berry,* 305 Pa.Super. 8, 14 n. 4, 451 A.2d 4, 7 n. 4 (1982) (stop and weighing of trucks "alternately justifiable as systematic stops...."); *see also Commonwealth v. Edwards,* 355 Pa.Super. 311, 317 n. 5, 513 A.2d 445, 448 n. 5 (1986) (non-arbitrary systematic roadblock passes *federal* constitutional muster); *Commonwealth v. Dannaker,* 352 Pa.Super. 611, 505 A.2d 1030 (1985) (Per Curiam Order and Memorandum per Wickersham, J., C.M. per Brosky, J.) (Allocatur granted) (non-arbitrary systematic roadblock passes *federal* constitutional muster).

While this Court should not hesitate to invalidate a roadblock or checkpoint which involved an unreasonable intrusion or an impermissible exercise of unbridled discretion by field officers, neither should we prohibit non-arbitrary systematic roadblocks on a wholesale basis.[15]

15. The courts of our sister states have uniformly rejected a *per se* rule. *See e.g. State v. Superior Ct.,* 143 Ariz. 45, 691 P.2d 1073 (1984); *Garrett v. Goodwin,* 569 F.Supp. 106 (E.D.Ark.1982) (applying Arkansas law); *Ingersoll v. Palmer,* 175 Cal.App.3d 1028, 221 Cal.Rptr. 659 (1985) (Review granted April 3, 1986); *People v. Andrews,* 173 Colo. 510, 484 P.2d 1207 (1971); *State v. Smolen,* 4 Conn.Cir. 385, 232 A.2d 339 (1967), *cert. denied,* 389 U.S. 1044, 88 S.Ct. 787, 19 L.Ed.2d 835 (1967); *State v. Stroman, supra; State v. Jones,* 483 So.2d 433 (Fla. 1986); *State v. Golden,* 171 Ga.App. 27, 318 S.E.2d 693 (1984); *People v. Bartley,* 109 Ill.2d 273, 93 Ill.Dec. 347, 486 N.E.2d 880 (1985); *State v. Garcia,* 481 N.E.2d 148 (Ind.App.1985); *State v. Riley,* 377 N.W.2d 242 (Iowa App.1985); *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983); *Kinslow v. Commonwealth,* 660 S.W.2d 677 (Ky.Ct.App.1983), *cert. denied,* 465 U.S. 1105, 104 S.Ct. 1606, 80 L.Ed.2d 136 (1984); *State v. Cloukey,* 486 A.2d 143 (Me.1985); *Little v. State,* 300 Md. 485, 479 A.2d 903 (1984); *Commonwealth v. Trumble,* 396 Mass. 81, 483 N.E.2d 1102 (1985); *Miller v. State,* 373 So.2d 1004 (Miss.1979); *State v. Crom,* 222 Neb. 273, 383 N.W.2d 461 (1986); *State v. Koppel,* 127 N.H. 286, 499 A.2d 977 (1985); *State v. Coccomo,* 177 N.J.Super. 575, 427 A.2d 131 (1980); *State v. Bloom,* 90 N.M. 192, 561 P.2d 465 (1977); *People v. Scott,* 63 N.Y.2d 518, 473 N.E.2d 1, 483 N.Y.S.2d 649 (1984); *State v. Trapper,* 48 N.C.App. 481, 269 S.E.2d 680 (1980); *State v. Goehring,* 374 N.W.2d 882 (N.D.1985); *State v. Goines,* 16 Ohio App.3d 168, 474 N.E.2d 1219 (1984); *State v. Smith,* 674 P.2d 562 (Okla.Crim.

## V.

■ Nonetheless, I agree that the procedures utilized in the instant case were constitutionally infirm. Factors which should be considered in determining the constitutionality of license and registration or sobriety checkpoint procedures include: the role of supervisory personnel; the degree of discretion vested in the field officers; the reasonableness and specificity of the established mode of operation; the reasonableness of site selection procedures; the time and duration of the operation; the average length of the initial detention; the reasonableness of secondary detention procedures; the indicia of the official nature of the roadblock; the maintenance of proper safety conditions (as to both motorists and officers); the publicity preceding implementation;[16] the comprehensive nature of the local highway safety program; and any other factors relevant under the particular circumstances. *See generally Ingersoll v. Palmer, supra; State v. Deskins, supra;* Champane, J., *The Constitutionality of Drunk Driver Roadblocks,* FBI Law Enforcement Bulletin (July 1984); NHTSA, *The Use of Safety Checkpoints for DWI Enforcement, supra,* at 11–14.

■ In *State v. Deskins, supra,* the Kansas Supreme Court stated:

1984); *State v. Shankle,* 58 Or.App. 134, 647 P.2d 959 (1982); *State v. Olgaard,* 248 N.W.2d 392 (S.D.1976); *Brown v. State,* 617 S.W.2d 196 (Tex.Cr.App.1981), *rev'd on other grounds sub nom. Texas v. Brown, supra; State v. Martin,* 145 Vt. 562, 496 A.2d 442 (1985); *Lowe v. Commonwealth,* 230 Va. 346, 337 S.E.2d 273 (1985); *State v. Frisby,* 245 S.E.2d 622 (W.Va.1978), *cert. denied,* 439 U.S. 1127, 99 S.Ct. 1043, 59 L.Ed.2d 87 (1978); *see also* LaFave, *Search and Seizure,* Vol. 3, § 10.8 a, g (1978 & Pocket Part 1986); Ringel, *Searches & Seizures, Arrests and Confessions,* § 11.6 (1986); Hall, *Search and Seizure,* § 10:31.1 (Cum.Supp.1986).

**16.** Advance publicity simultaneously decreases intrusiveness and increases effectiveness; motorists will be more wary and less surprised. Its importance should not be overlooked. *Accord State v. Ekstrom,* 136 Ariz. 1, 663 P.2d 992, 1001 (1983); *State v. Deskins,* 673 P.2d at 1182; *Jones v. State,* 459 So.2d at 1076. Of course, it is the *use* of such procedures which should be announced, *and not the precise time and locations where they will be used.*

Not all factors need to be favorable to the state, but all which are applicable to a given roadblock should be considered. *Some of course, such as unbridled discretion of the officer in the field, would run afoul of Prouse regardless of favorable factors.*

673 P.2d at 1185. (Emphasis added). I agree, and would find that in the instant case the degree of discretion vested in the field officers rendered the procedures constitutionally infirm. The field officers were permitted to choose the time, date, and location of the safety check. Moreover, there were no written guidelines or procedures, and the record does not indicate that adequate instructions regarding the operation of the safety check were given by supervisory personnel. This is precisely the type of unbridled discretion which the Pennsylvania and United States Supreme Courts have condemned. *See Prouse, supra; Swanger, supra.* Because the initial stop was illegal, all the evidence derived therefrom must be suppressed. *Swanger,* 453 Pa. at 114–115, 307 A.2d at 879, *citing Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Finally, it is important to note that not all that is constitutional is wise. While it is for the courts to ensure that police practices meet minimum constitutional standards, it is for law enforcement agencies, the legislature, and ultimately the people of this Commonwealth to debate the wisdom of such procedures and the additional conditions, if any, under which they may be employed.[17]

BROSKY and ROBERTS, JJ., concur.

**17.** In order to forestall repeated litigation and prevent abuse, it may be advisable that minimum uniform standards for the operation of vehicle roadblocks be adopted and established by the legislature, attorney general, or another appropriate state official, rather than leaving the determination thereof to local officials. *See Ingersoll v. Palmer, supra* (guidelines announced in Attorney General's Opinion, 67 Ops. Cal. Atty. Gen. 471 (1984)); *State v. Garcia, supra* (guidelines developed by county police departments adopted by State Police Department); *State v. Trumble, supra* (guidelines developed by Secretary of Public Safety in consultation with other interested parties); *accord State v. Deskins, supra* (recommending attorney general or

66

BROSKY and ROBERTS, JJ., concurring:

In *Commonwealth v. Tarbert,* 348 Pa.Super. 306, 502 A.2d 221 (1986) (allocatur granted), this Court held that random roadblocks violate Article I, § 8 of the Pennsylvania Constitution. In our view, *Tarbert* clearly controls this case. Therefore, we concur only in the result.

legislative action); *State v. Jones, supra* (requiring written set of uniform guidelines).