177 N.J. Super. 575 (1980)
427 A.2d 131
STATE OF NEW JERSEY, PLAINTIFF,
v.
MICHAEL A. COCCOMO, DEFENDANT.
Superior Court of New Jersey, Law Division Morris County.
Decided September 26, 1980.
*578 Janemary S. Correia, Assistant Prosecutor, for the State. (Peter D. Manahan, Morris County Prosecutor).
Stuart B. Klepesch for defendant Coccomo. (Sweetwood and Cahn, attorneys).
MacKENZIE, J.S.C.
This is a motion to suppress evidence. R. 3:5-7.
The police practice of stopping a motor vehicle for a routine document check has been barred in New Jersey since March 27, 1979. State v. Carpentieri, 82 N.J. 546, 548 (1980), *579 gives prospective application only to the deterrent principles underlying Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Since Prouse the police may not make a totally random or discretionary stop of an automobile, nor may the State use at trial any evidence seized while the driver was so detained. The officer must have an articulable and reasonable belief that the driver is unlicensed, or the car unregistered or uninsured, or the motorist or occupant is otherwise subject to seizure.
The written policy of the Roxbury Township police department is to stop every fifth vehicle during certain light traffic hours.[1] The purpose of these road stops was to check the driver for his license, registration and insurance card, under the authority of N.J.S.A. 39:3-29,[2] as well as for any apparent outward indication of intoxication. Is this system of nonselective and nondiscretionary spot-checking constitutionally permissible? This question is raised directly by defendant's motion.
The facts are not in issue. Sometime around 1:30 a.m. on April 5, 1980 a detail of Roxbury Police put a roadstop procedure into operation on southbound Main Road in the Landing section of the township. Every fifth vehicle going past the *580 checkpoint was stopped and the driver of each stopped vehicle was asked for his license, his registration and his insurance card. At about 2:55 a.m., while traffic was light, defendant's car was in fact the fifth vehicle to approach the check point since the last previous vehicle had been stopped.[3] Defendant was directed by a police captain to pull off the roadway and into a parking lot where all diverted vehicles were checked by other policemen on the detail.[4]
Defendant was unable to produce his insurance identification card after having been asked to produce his driving credentials by one of the policemen. The officer then noticed that the defendant's eyes were bloodshot and that he had an odor of alcohol on his breath. While stepping out of the car at the officer's direction, defendant fell backwards against his car and then steadied himself by grasping the car roof. The policeman asked if he had been drinking; defendant admitted that he had drunk a number of alcoholic beverages at a local bar. Defendant was asked to recite the alphabet but was unable to do so. Defendant was unable to walk heel to toe. He was then arrested on a charge of violating N.J.S.A. 39:4-50(a).[5]
Enroute to the police station defendant fell asleep in the rear of the patrol car. Once at the station defendant was read his rights concerning operating a motor vehicle in violation of *581 the New Jersey Drinking-Driving Law. He then agreed to take the breath test.[6]
Defendant relies on Prouse and Carpentieri in seeking to suppress all incriminatory evidence. He claims that the results of the field testing and of the breath test constitute an illegal search because his preceding detention was an invalid seizure of his person.[7] His position fails.
Why does not Prouse control on these facts? In prohibiting random, discretionary vehicular stops the Supreme Court did not "preclude the [states] from developing methods for spot checks that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock type stops is one possible alternative." 440 U.S. at 663, 99 S.Ct. at 1041.[8] On this point New Jersey decisional authority is consistent with federal constitutional law. "[T]he practice of establishing roadblocks by the police for license card ... registration checks" is not an unconstitutional invasion of privacy. State v. *582 Kabayama, 98 N.J. Super. 85, 87 (App.Div. 1967), aff'd o.b. 52 N.J. 507 (1968).
No one can deny the State's vital interest in promoting public safety upon our roads by detecting and prosecuting drunk drivers.[9] These drivers are a threat to other motorists, to pedestrians and to themselves. Unfit drivers should be identified and removed from the highways. However, there is obviously a competing interest to be considered. Whether the practice adopted in Roxbury Township is reasonable depends upon a balancing of the State's interest in promoting highway safety against the individual motorist's interest in his expectation of privacy.
I conclude that the Roxbury program is sufficiently productive to qualify as a reasonable law enforcement practice. Main Road connects the Landing section of Lake Hopatcong, where many bars are located, with U.S. Route 46. Empirical data revealed that seven fatal vehicular accidents had occurred on Main Road, (or its extension in Hopatcong Borough) during the two years prior to the implementation of this procedure. In most of the fatal accidents alcohol abuse by the driver of a vehicle was a contributing factor. A reasonable conclusion to be reached from this data is that Main Road had become a dangerous thoroughfare because of the large number of intoxicated drivers using it. Numerous arrests for drunk driving have resulted since the program was instituted. Thus, the policy seems to be a productive mechanism for identifying unsafe drivers.
*583 The policy of stopping vehicles applies only when traffic is light. Ordinarily, the program is put into effect only in the early morning hours. Those hours were chosen to coincide with the closing hours of local taverns. Stopping every fifth car when traffic is heavy, or even moderate, would create a substantial risk of danger both to motorists and to police and would result in the detaining of an excessive number of vehicles at one time. If traffic increases when the program is in effect, the officer in command of the detail orders a discontinuation of the road checks.
The actual manner of stopping vehicles is designed both to promote safety and reduce anxiety on the part of motorists. Flares are positioned on the paved roadway to alert drivers to use caution and to be alert. A uniformed police officer who is involved in counting vehicles and waving over the fifth one stands on the roadway at the end of the line of flares and under a street light. A marked police car is parked by the side of the road. Drivers of diverted vehicles are directed into an adjacent parking lot where they await the arrival of other uniformed officers. The questioning of drivers takes place in the parking lot. It is obvious that safeguards for protection of all those involved have been built into the Roxbury system.
It is apparent that the Roxbury Township police follow specific, defined standards in stopping motorists. Their system is completely objective in its operation. The criterion they employ is purely neutral; no discretion is involved. The evil implicit in the use by police of standardless and unbridled discretion to stop vehicles, which has been prohibited by Prouse, simply is not present here. Further, the Roxbury Township police procedure is consonant with New Jersey law regarding roadblock stops. State v. Kabayama, 98 N.J. Super. at 88.
After balancing the State's strong interest in protecting the public from the substantial risk posed by drunk drivers with the minor inconvenience which may be caused to every fifth motorist and the fleeting, minimal intrusion upon his *584 privacy, the State's action must be considered as a reasonable infringement upon the motorist's expectation of privacy. Nor did the stop become overly intrusive when defendant was asked to produce his license and registration. When the initial detention is lawful as it was here, the police may require the driver to produce his driving credentials. N.J.S.A. 39:3-29.
I conclude that neither the Fourth Amendment of the United States Constitution, nor the parallel provision of our State Constitution, N.J.Const. (1947), Art. I, par. 7, is offended by the Roxbury program. The principles of deterrence underlying Prouse are not offended by the Roxbury program. The Roxbury police have simply adjusted their systems and procedures to accommodate evolving concepts of constitutional law. The motion is denied.
NOTES
[1] In September 1979, the Morris County Prosecutor strongly urged each municipal police department to adopt rules and procedures to adjust their police practices to the Prouse proscriptions. Along with a summary of Prouse, a set of regulations approved by the Attorney General of New Jersey was also forwarded to the chiefs. The chief of police of Roxbury, by his memorandum of January 24, 1980, directed his officers to make the following procedure a part of a pilot program to stem the rising number of fatal and other vehicular accidents attributable to intoxicated drivers. The chief's memorandum states:

As of this date should road checks be made for driving while intoxicated, or other checks it shall be this department's procedure to stop every 5th car during light traffic hours. This procedure shall be incorporated into this Departments [sic] regulations as of this date.
[2] Neither directly nor by implication has Prouse or Carpentieri invalidated N.J.S.A. 39:3-29. See Justice Pashman dissenting in State v. Carpentieri, 82 N.J. at 563, n. 5.
[3] The police did not keep a record of the cars passing the check point. In the future, it would be advisable for the police to maintain a complete and accurate log to avoid charges of selectivity or prejudicial enforcement of this policy.
[4] There was no articulable reason for the police to believe defendant was violating any motor vehicle law, any traffic regulation or any other law. Absence of an articulable cause to stop cars is irrelevant when the police employ roadblock stops. Delaware v. Prouse, 440 U.S. at 663, 99 S.Ct. at 1401.
[5] At that point, probable cause existed to believe that defendant was under the influence of an alcoholic beverage.
[6] Defendant was given two breathalyzer tests at police headquarters and readings of .15% and .14% blood alcohol were produced. There was a valid consent. See State v. Macuk, 57 N.J. 1 (1970).
[7] Defendant did not attempt to show that the stop of his car or the police procedure employed thereafter generated any fright, anxiety, concern or even annoyance. On these facts this selective spot-checking program produced no objective or subjective effect upon defendant. When an auto is stopped at a check point, "the motorist can see that other vehicles are being stopped, he can see visible signs of the officer's authority and he is much less likely to be frightened or annoyed by the intrusion." See Delaware v. Prouse, 440 U.S. at 657, 99 S.Ct. at 1398.
[8] Justice Blackmun, in his concurring opinion in Prouse, 440 U.S. at 663-664, 99 S.Ct. at 1401; suggests constitutionally acceptable alternatives to a full roadblock stop:

The Court ... carefully protects from the reach of its decision other less intrusive spot checks "that do not involve the unconstrained exercise of discretion." The roadblock stop for all traffic is given as an example. I necessarily assume that the Court's reservation also includes other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop.
[9] There is the strong public policy underlying the enforcement of the drunken driving law and the blood alcohol test requirements relating thereto. See State v. Macuk, 57 N.J. 1 (1970); State v. Burns, 159 N.J. Super. 539 (App.Div. 1978). Thus in drunken driving cases, notwithstanding the invalidity of an arrest, the subsequent enforced subjection of a defendant to an examination for intoxication is justified as an emergency measure to assure the State against loss of evidence of defendant's guilt of an offense which "poses an extremely grave menace to the public safety and welfare." State v. Macuk, 57 N.J. at 8.