Joseph Dolan Executive Director Department of Highways 4201 E. Arkansas Avenue Denver, CO 80222
Dear Mr. Dolan:
This opinion letter is in response to your June 7, 1985 letter, in which you inquired about the legality of roadside sobriety checkpoints as a method for the detection of violators and enforcement of the laws relating to drunk driving.
QUESTION PRESENTED AND CONCLUSION
Your request for an attorney general's opinion presents the following question:
May a law enforcement agency lawfully utilize sobriety checkpoints in the detection and apprehension of persons driving under the influence of alcohol?
 Law enforcement agencies may lawfully utilize sobriety checkpoints in the detection and apprehension of persons driving under the influence of alcohol as long as adequate safeguards are maintained to minimize the intrusion on the individual motorist.
ANALYSIS
Law enforcement agencies are constantly seeking new measures to combat the problem of "drunk drivers." Several agencies, including the Colorado Division of Highways Safety, believe sobriety checkpoints can be an effective deterrent to drinking and driving. However, implicit in the use of sobriety checkpoints is the fact that peace officers conducting the checkpoints will stop vehicles without probable cause or any reasonable suspicion that motorists are intoxicated. This fact raises questions about the validity of such a procedure under theFourth Amendment of the United States Constitution, and its equivalent article II, section 7 of the Colorado constitution, which protects the individual against "unreasonable search and seizure."
The reasonableness of vehicle stops was evaluated at length by the United States Supreme Court in a series of three cases involving the use of various levels of such stops to prevent the illegal entry of aliens at the Mexican border. After rejecting the use of a roving patrol, United States v.Brigroni-Ponce [Brignoni-Ponce], 422 U.S. 873 (1975), and checkpoints considerably removed from the Mexican border, United Statesv. Ortiz, 422 U.S. 891 (1975), the court approved the use of permanent checkpoints at strategic points near an intersection of major highways leading from the border. U. S. v.Martinez-Fuerte, 428 U.S. 543 (1976). After evaluating the procedure used by the officers, the court balanced the individual's interests with the interest of the state in preventing the entrance of illegal aliens into the county. The court concluded that the need for the checkpoint was great and the intrusion on the individual minimal, and held that such stops could be made in the absence of any individualized suspicion.
The reasoning of the border cases was adopted in the United States Supreme Court's decision in Delaware v. Prouse,440 U.S. 648 1979). In that case, evidence found in plain view was suppressed where the officer, without having a reasonable belief that the defendant had violated any law, selectively stopped the defendant's vehicle merely to check the driver's license and registration. The court held that except in situations where there is at least "articulable and reasonable" suspicion that the motorist or a vehicle occupant violated a law, randomly stopping an automobile and detaining the driver in order to check his license and registration was unreasonable under theFourth Amendment. However, the court went on in dicta to say:
 This holding does not preclude the State of Delaware or other states from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all on-coming traffic at roadblock-type stops is one possible alternative.
Id. at 663 (emphasis added).
The court noted in Prouse that the crucial distinction between roving patrol and checkpoint stops was the lesser intrusion of checkpoint stops on the motorists' Fourth Amendment interests. Quoting from U.S. v. Martinez-Fuerte,supra, the court said:
 The objective intrusion — the stop itself, the questioning and the visual inspection — also existed in roving patrol stops. But we view checkpoint stops in a different light because the subjective intrusion — the generating of concern or even fright on the part of lawful travelers — is appreciably less in the case of a checkpoint stop.
440 U.S. at 656.
In adopting this language, the Prouse court implied that roadblock stops are permissible to enforce laws in addition to immigration laws. This position is supported by the United States Supreme Courts' decision in Texas v. Brown,460 U.S. 730 (1983), where the court approved of a routine roadblock license check.
Although no Colorado appellate court has ruled on the validity of "sobriety checkpoints" as a law enforcement procedure, the Colorado Supreme Court has evaluated the use of roadblock-type stops to enforce other laws.
In People v. Andrews, 173 Colo, 510, 513-514, 484 P.2d 1207
(1973), the court approved the practice of stopping all vehicles at a roadblock-type stop for the purpose of checking "safety equipment, brakes, license plates and drivers' licenses." Similarly, the court approved the use of checkpoints to enforce fish and game laws in People v. Benner, 187 Colo. 309,530 P.2d 964 (1975).
Another factor to consider is section 42-4-1202.1, C.R.S. (1984), which states:
 A law enforcement officer may stop any person who he reasonably suspects is committing or has committed a violation of section 42-4-1202 (1) or (1.5) and may require him to give his name, his address, and an explanation of his actions. The stopping shall not constitute an arrest.
Under this statute, a reasonable suspicion is required toselectively stop a motorist. While section 42-4-1202.1 does not explicitly exclude roadblock-type stops from the reasonable suspicion requirement, based on holdings inDelaware v. Prouse and People v. Andrews, it is reasonable to assume that the legislature did not intend this section to apply to systematic stops of all vehicles.
The standard for determining whether a law enforcement practice is acceptable is also found in Delaware v. Prouse, where the court stated:
 The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against the promotion of a legitimate government interest.
440 U.S. at 654.
The factors to be considered in doing this balancing were described by the Oregon Supreme Court in State v.Tourtillott, 289 Or. 815, 618 P.2d 423, 433 (1960), in a case involving the use of a roadblock-type stop to enforce wildlife laws:
(1) the importance of the governmental interest at stake;
(2) the psychologically and physically intrusive nature of the procedure;
(3) the efficiency of the procedure in reaching its desired goals;
(4) the degree of discretion the procedure vests in the individual officer.
Several state appellate courts have, in recent years, addressed the constitutionality of sobriety checkpoints. Courts in Mississippi, New Jersey, Oregon, Kansas, Kentucky, Maryland, Arizona and New York have approved the use of checkpoints. Miller v. State, 373 So.2d 1004 (Miss. 1984); State v. Coccomro, 427 A.2d 131 (N.J.Super. 1980); State v. Shankle, 647 P.2d 959
(Or.Ct.App. 1982); State v. Deskins, 673 P.2d 1174 (Kan. 1983); Kinslow v. Commonwealth, 660 S.W.2d 677 (Ky. 1983); Little/Odom v. State, 479 A.2d 903
(Md. 1984); State v. Superior Court, 691 P.2d 1073
(Ariz. 1984); (distinguishing particular roadblock from one disapproved in State ex rel. Ekstrom v. Justice Court,663 P.2d 992 (Ariz.Ct.App. 1983)); People v. Scott,473 N.E.2d 1 (N.Y. 1984). In addition, three cases in Iowa, Massachusetts and Florida courts have held that while sobriety checkpoints with adequate safeguards might be reasonable under the Fourth Amendment, the checkpoints considered did not comply.State v. Hillesheim, 291 N.W.2d 314 (Iowa 1980); Commonwealth v. McGeoghegan, 449 N.E.2d 349
(Mass. 1983); Jones v. State 459 So.2d 1068 (Fla. Dist. Ct. App. 1984).
A few courts have held the sobriety checkpoints are violative of the Fourth Amendment. In State v. Olgaard,248 N.W.2d 392 (S.D. 1976), the Supreme Court in South Dakota, in an opinion issued before the United States Supreme Court decision inDelaware v. Prouse, held that, unless authorized by prior judicial warrant, a sobriety checkpoint constitutes an unlawful seizure. The court found that the roadblock was not at a long term, permanent location, that there was no notice of the roadblock and, absent evidence that the decision to establish the roadblock was made by anyone other than officers in the field, "the roadblock in question had certain characteristics of a roving patrol, a type of intrusion into a motorist's privacy interest that was held unconstitutional in Almeida-Sanchezv. United States," 248 N.W.2d at 394-395.
In State v. Smith, 674 P.2d 562 (Okla. 1984), the Oklahoma Criminal Court of Appeals held a temporary driver's license checkpoint used to determine sobriety unconstitutional because it was more likely to cause fear and surprise than a permanent facility.
The Illinois Appellate Court in People v. Bartley,466 N.E.2d 346 (Ill.App.Ct. 1984), found a sobriety checkpoint unconstitutional because the state failed to demonstrate the "superiority of a roadblock" over less intrusive means of detecting drunk drivers. Further, the court noted that it was "unaware of any criteria used by supervisory officers in determining the need, location, time and duration of a roadblock."
A review of the cases indicates that the courts will look to several factors in determining weight to be given to both sides of the constitutional balancing test. In States v.Deskins, 673 P.2d at 1185, the Kansas Supreme Court elaborated on the factors identified in State v.Tourtillott, supra, in the context of evaluating a sobriety checkpoint procedure and enumerated the following concerns:
(1) the degree of discretion, if any, left to the officer in the field;
(2) the location designated for the roadblock;
(3) the time and duration of the roadblock;
(4) standards set by superior officers;
(5) advance notice to the public at large;
(6) advance warning to the individual approaching motorist;
(7) maintenance of safety conditions;
(8) degree of fear or anxiety generated by the mode of operation;
(9) average length of time each motorist is detained;
(10) physical factors surrounding the location, type and method of operation;
(11) the availability of less intrusive methods for combating the problem;
(12) the degree of effectiveness of the procedure.
1. DISCRETION LEFT TO FIELD OFFICER
In Delaware v. Prouse, supra, the court observed that one of the most abhorrent factors in the roving-type stop was that it allowed the "unbridled discretion" of the individual officer. State courts reviewing sobriety checkpoints have consistently found such procedures unacceptable in situations where the level of discretion left to front-line officers might lead to abuse. See State e. rel.Ekstrom, supra, 663 P.2d at 996; State v.Olgaard, supra, 248 N.W.2d 392.
2. LOCATION OF SOBRIETY CHECKPOINTS
In U.S. v. Martinez-Fuerte, supra, 428 U.S. 543, the court approved the use of "reasonably located checkpoints" for immigration law enforcement chosen by officials responsible for allocating limited resources to meet government goals. Using this rationale, locations should be chosen by policy-making officials and should be those which will be most effective in accomplishing the government objective, i.e. roads having a high incidence of drunk driving as evidenced by arrests and accident statistics. See State v.Coccomo, supra, 427 A.2d at 134. In addition, the temporary location should be chosen to avoid the dangers of a roving patrol. Compare State v. Olgaard,supra, 284 N.W.2d at 392 with Little/Odom v.State, supra, 479 A.2d 903 and Jones v.State, 459 So.2d 1068.
3. TIME AND DURATION OF SOBRIETY CHECKPOINTS
Most of the cases where the procedure was approved involved night time checkpoints of a couple of hours duration. Like the location of checkpoints, the time of day in which the procedure is conducted should be chosen based on analysis of when the governmental objective is best served.
4. STANDARDS SET BY SUPERIOR OFFICERS
Hand-in-hand with the requirement of limited officer discretion is the desirability of comprehensive standards and procedures formulated and approved by high level administrators. Several courts have looked approvingly on operations guided by such standards. See State v. Coccomo, supra,427 A.2d at 133; Kansas v. Deskins, supra, 673 P.2d 1185; Little/Odom v. State, supra,479 A.2d at 913; State v. Superior Court, 691 P.2d 1073. Courts disapproving such checkpoints also have pointed to the lack of such plans, see State ex rel. Ekstrom v.Justice Court, supra, 633 P.2d at 993;Commonwealth v. McGeoghegan, supra,449 N.E.2d at 351; Jones v. State, 459 So.2d 1068.
5. ADVANCE NOTICE TO PUBLIC
Advance publicity serves to establish the legitimacy of the checkpoint, enhances the deterrent effect of the checkpoint, and as the court noted in Jones v. States, 459 So.2d 1068, "advance publication of the date of an intended roadblock, even without announcing its precise location, would have the virtue of reducing surprise, fear and inconvenience."
6. ADVANCE WARNING TO APPROACHING MOTORISTS
The lack of advance warning has been pointed out by several courts disapproving of a checkpoint procedure. State v.Olgaard, supra; State ex rel.Ekstrom v. Justice Court, supra; State v.Smith, supra. Advance warning can alleviate fear and anxiety in motorists and as noted by the court inLittle/Odom v. States, supra. When adequate advance warning of the checkpoint is given; motorists who do not to stop may make a U-turn and follow a different route."
7. MAINTENANCE OF SAFETY CONDITIONS
Courts have consistently been concerned with the safety at checkpoints. Well-lighted and designed checkpoints should be geared toward reducing risk both to the motorists and the police.
8. FEAR AND ANXIETY GENERATED BY THE MODE OF OPERATION
In U.S. v. Martinez-Fuerte, supra, and inDelaware v. Prouse, supra, the U.S. Supreme Court emphasized what it believed was a significant distinction between the concern, and even fear, generated by a roving-type stop versus the roadblock-type stop. As noted previously, the use of advance publicity to the public, advance warning to the motorists, and the maintenance of safety all serve to reduce such anxiety.
9. AVERAGE LENGTH OF TIME EACH MOTORIST IS DETAINED
Courts have looked to the length of detention in determining the extent of intrusion on the individual motorist. Obviously, the shorter the detention, the more likely a court will be to consider it an acceptable intrusion.
 10. PHYSICAL FACTORS SURROUNDING THE LOCATION, TYPE, AND METHOD OF OPERATION
In addition to the maintenance of safety, the existence of advance warning, and the length of the stop, courts have looked to other aspects of the procedure that limit the intrusion on the individual. Asking for a driver's license has been approved,State v. Coccomo, 427 A.2d at 133; Kansas v.Deskins, 673 P.2d at 1177, as has stopping only a portion of the motorists passing the checkpoint in a systematic and predetermined manner. Delaware v. Prouse,440 U.S. at 663-664 (concurring opinion); State v.Coccomo, supra at 133.
However, it is clear that the "reasonable grounds" requirement of section 42-4-1202(3)(b) must be met in order to subject an individual to a chemical test for intoxication.
11. AVAILABILITY OF LESS INTRUSIVE METHODS FOR COMBATING THE PROBLEM
In developing a sobriety checkpoint procedure policy-makers should consider carefully the availability of other methods. Factors to consider include the resources available to combat the problem and the effectiveness of the procedure. The administrator should keep in mind the court's comment inDelaware v. Prouse, supra, 440 U.S. at 659. "The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations."
12. DEGREE OF EFFECTIVENESS OF PROCEDURE
Most of the courts considering the use of sobriety checkpoints have been concerned with the effectiveness of the procedure. Administrators should carefully study this factor both in terms of checkpoints in general and the use of the use of a specific checkpoint site. However, a court is likely to look favorably on a procedure's effectiveness if its deterrent effect can be established by proven statistical techniques.
SUMMARY
A survey of the case law dealing with sobriety checkpoints reveal that all these factors are interrelated, and that no one factor will assure that a particular procedure will pass constitutional muster. Therefore, it is important that considerable planning go into the development of a policy for the use of sobriety checkpoints and for the implementation of a particular roadblock. Further, special care should be taken to document the basis for the policy, the selection of a particular roadblock site, and the implementation of the roadblock.
There can be no argument that the removal of the drunk driver from the roadway is an important governmental interest.E.g., Mackey v. Montrym, 443 U.S. 1 (1979). By developing a procedure which limits the intrusion on the individual and effectively serves the goal of reducing the number of intoxicated motorists on the highway, it is likely that a court will see the constitutional balance tipped in favor of the use of sobriety checkpoints.
Very truly yours,
 DUANE WOODARD Attorney General
ARREST MOTOR VEHICLES PEACE OFFICERS POLICE SEARCH AND SEIZURE TRAFFIC
Section 42-4-1202.1, C.R.S. (1984)
HIGHWAYS, DEPT. OF HIGHWAYS SAFETY DEPT OF PUBLIC SAFETY COLO. STATE PATROL
Law enforcement agencies may lawfully utilize sobriety checkpoint in the detection and apprehension of persons driving under the influence of alcohol as long as adequate safeguards are maintained to minimize the intrusion on the individual motorist.