258 N.J. Super. 599 (1992)
610 A.2d 916
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
EDWARD KADELAK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 28, 1992.
Decided August 6, 1992.
*600 Before Judges O'BRIEN, HAVEY and CONLEY.
M. Daniel Kantor argued the cause for appellant.
Deborah Ann Siegrist, Assistant Prosecutor, argued the cause for respondent (Stephen G. Raymond, Burlington County Prosecutor, attorney; Larry E. Holtz, Assistant Prosecutor, of counsel and on the letter brief).
American Civil Liberties Union of New Jersey, Amicus Curiae (Deborah A. Ellis and Lisa Glick Zucker, of counsel; Suzanne Engelhardt, on the letter brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
In this driving while intoxicated (DWI) case, defendant appeals from the denial of his motion to suppress based upon his contention that the roadside safety check in which he was stopped violated his state and federal constitutional rights. We reverse and remand for reconsideration.
On August 9, 1990, the Bordentown City Police and the State Division of Motor Vehicles (DMV) conducted a "roadside safety check" in which local police and a team of inspectors from the DMV stopped oncoming cars to conduct an inspection of the vehicle and the credentials of the operator. The particular roadblock under review was conducted on Park Street, which had been selected by the chief of police. Park Street is a long, straight roadway, adjacent to which is a lot approximately 200 feet long and 50 feet deep owned by Ocean Spray and used by it to park tractor trailers not in use. This location was selected because the lot was a safe place to pull vehicles off the road for inspection, not because of any history of accidents in this area. Signs approximately three and one-half feet square were posted for both eastbound and westbound traffic, advising approaching vehicles to use caution because there was a roadside check ahead. Fifty feet beyond the sign, traffic cones were lined up in the middle of the roadway.
*601 The officers on the roadway had been orally instructed by the police chief to stop every fifth vehicle as well as any vehicle with an obvious equipment violation, such as a broken headlight or cracked windshield, or an overdue inspection sticker. The vehicles stopped were directed over to the adjacent lot where the vehicle was inspected for "just about everything that would be checked in the motor vehicle inspection; tires, lights, horns, pollution  and documentation."
The roadside safety check was conducted from 9:00 a.m. to 3:00 p.m. These hours were selected because of the availability of the motor vehicle inspectors. The request for the roadside inspection emanated from the police department to the DMV and was then set up based upon the availability of DMV inspectors.[1] This was the first roadside safety check conducted by this department and no advance publicity or notice had been given that it was to be held. One other has been conducted since. At approximately 10:30 a.m., defendant's pickup truck was stopped because it was a fifth car in the line. It did not have any obvious equipment violations nor an overdue inspection sticker. Defendant was found to be intoxicated and was charged with DWI (N.J.S.A. 39:4-50).[2]
Defendant moved before the Bordentown Municipal Court to suppress evidence of his intoxication because of the warrantless seizure of his vehicle in the roadside safety check. Defendant contended that stopping his vehicle violated his Fourth Amendment rights under the United States Constitution, and his rights under Article I, paragraph 7, of the New Jersey Constitution. The municipal court judge denied the motion, finding that the police conducted the roadblock at the request of motor vehicle *602 inspectors who had absolutely no police authority. He found it to be a roadside safety check by the DMV, which has the right and statutory duty to perform safety inspections of motor vehicles. He found that when, in the course of the safety inspection, they came upon defendant under the influence of alcohol, the DMV inspectors "called in standby police." Defendant then pled guilty to DWI and was sentenced.
Defendant appealed to the Law Division. After extensive oral argument the Law Division judge rendered a written opinion on June 18, 1991, denying the motion to suppress. Defendant was again found guilty of DWI and sentenced. Although initially the stay granted by the municipal court was vacated, the judgment was stayed pending defendant's appeal to us by consent order dated June 24, 1991.
It is conceded by the State that unreasonable searches and seizures are prohibited by the Fourth Amendment to the United States Constitution, as well as Article I, paragraph 7 of the New Jersey Constitution. New Jersey courts have interpreted Article I, paragraph 7 of our constitution to afford greater privacy protection and freedom from unreasonable searches and seizures than the Fourth Amendment to the United States Constitution. See State v. Hempele, 120 N.J. 182, 576 A.2d 793 (1990); State v. Novembrino, 105 N.J. 95, 519 A.2d 820 (1987); State v. Kirk, 202 N.J. Super. 28, 493 A.2d 1271 (App.Div. 1985). In Kirk, we reviewed the law in New Jersey concerning the establishment of a sobriety roadblock, which had previously been approved by the Law Division in State v. Coccomo, 177 N.J. Super. 575, 427 A.2d 131 (Law Div. 1979).
Earlier the Morris County Court in State v. Kabayama, 94 N.J. Super. 78, 226 A.2d 760 (Cty.Ct.), aff'd, 98 N.J. Super. 85, 236 A.2d 164 (App.Div. 1967), aff'd o.b., 52 N.J. 507, 246 A.2d 714 (1968) had found a roadblock established by police to stop all automobiles for a routine check of drivers' licenses and vehicle registration certificates to be a reasonable exercise of the State's police power and not in violation of the drivers' *603 federal or state constitutional rights. In Kabayama, the roadblock was found to give effect to N.J.S.A. 39:3-29, requiring a driver to exhibit his driver's license and registration upon request.
However, after the United States Supreme Court decision in Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), Justice Clifford observed in State v. Carpentieri, 82 N.J. 546, 548, 414 A.2d 966 (1980):
There is, of course, no question that Prouse effected a radical departure from the state of our law as it existed up until the date of that decision, for until then such random stops were expressly authorized under case law in New Jersey, see State v. Gray, 59 N.J. 563, 567, 285 A.2d 1 (1971); State v. Braxton, 57 N.J. 286, 287, 271 A.2d 713 (1970); State v. Kabayama, 98 N.J. Super. 85, 87-88, 236 A.2d 164 (App.Div. 1967), aff'd o.b., 52 N.J. 507, 246 A.2d 714 (1968), and at least inferentially under our statutory law, see N.J.S.A. 39:3-29.
Justice Handler observed in State v. Gervasio, 94 N.J. 23, 25, 462 A.2d 144 (1983), that Prouse "represented a clear break with the preexisting state of constitutional adjudication."
Delaware v. Prouse, held:
[T]hat except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. [440 U.S. at 663, 99 S.Ct. at 1401.]
In reaching that conclusion, the Prouse Court observed:
The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations. Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject to inspection and drivers without them will be ascertained. Furthermore, drivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves. Absent some empirical data to the contrary, it must be assumed that finding an unlicensed driver among those who commit traffic violations is a much more likely event than finding an unlicensed driver by choosing randomly from the entire universe of drivers. If this were not so, licensing of drivers would hardly be an effective means of promoting roadway safety.... The contribution to highway safety made by discretionary stops selected from among drivers generally will therefore be marginal at best.... In terms of actually discovering unlicensed drivers or deterring them from driving, the spot check does not appear *604 sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment. [Id., 440 U.S. at 659-660, 99 S.Ct. at 1399.]
With regard to safety checks of the automobile the Court said:
Much the same can be said about the safety aspects of automobiles as distinguished from drivers. Many violations of minimum vehicle-safety requirements are observable, and something can be done about them by the observing officer, directly and immediately. Furthermore, in Delaware, as elsewhere, vehicles must carry and display current license plates, which themselves evidence that the vehicle is properly registered; and, under Delaware law, to qualify for annual registration a vehicle must pass the annual safety inspection and be properly insured. It does not appear, therefore, that a stop of a Delaware-registered vehicle is necessary in order to ascertain compliance with the State's registration requirements. [Id. 440 U.S. at 660-661, 99 S.Ct. at 1399-1400.]
However, the Prouse Court explained:
This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one alternative. [Id. 440 U.S. at 663, 99 S.Ct. at 1401.]
The United States Supreme Court again addressed the question in connection with sobriety checkpoints in Michigan State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) as we had in State v. Kirk, supra. In this case we do not deal with sobriety checkpoints where the public interest in ridding the highway of drunk drivers has been the subject of much empirical data and may even be self-evident. In a state which requires annual inspection of vehicles for safety, the need for roadside inspections in addition is not entirely clear.
In the course of his opinion denying defendant's motion, the Law Division judge referred to N.J.S.A. 39:8-2, which in pertinent part provides:
The director shall conduct random roadside examinations of motor vehicles required to be inspected in this state to provide a continuous monitoring of motor vehicles. Each year at least 1% of the total number of motor vehicles registered in the State shall be inspected by roadside examination teams under the supervision of the director.
The judge then observed,
Unfortunately the director has not adopted or published any regulations, at least that this court's research has produced which implement this statute by *605 establishing criteria for the setting up and/or operation of such roadside inspections.
Notwithstanding that observation, the judge concluded that this statute constituted a legislative mandate to the Director of DMV, to conduct constitutionally proper warrantless stops and seizures of 1% of motor vehicles registered in New Jersey under the guidelines of case law, including Delaware v. Prouse, which have carved out the so-called automobile exception to the warrant requirement.
The Law Division judge then speculated:
I detect a policy inference emanating from the statute that if New Jersey registers five million cars, inspecting at least 1% of them, or 50,000 cars annually by this method, will have a substantial and salutary impact on the safety of the traveling public as against a minimal impact on the right to travel freely. I further find that the statutory mandate to conduct roadside safety inspections, at the least, constitutes a legislative determination that the public interest in motor vehicle equipment safety is advanced to a greater degree than is achieved by the traditionally less intrusive means provided by the Motor Vehicle Inspection Stations and private garage licensees operating alone. [State v. Moskal, 246 N.J. Super. 12, 17, 586 A.2d 845 (App.Div. 1991)] The Legislature could also reasonably find that the potential of random roadside inspections encourages more timely and widespread use of the fixed inspection stations. These kinds of considerations, being legislative, are entitled to great weight and are matters upon which the court should not substitute its judgment unless the statute clearly treads on Fourth Amendment protections. I conclude that as so construed and limited it does not.
The judge then proceeded to examine the details of the safety inspection roadblock against the criteria of State v. Moskal, 246 N.J. Super. 12, 586 A.2d 845 (App.Div. 1991) and State v. Kirk, supra, both dealing with sobriety check points, and concluded that the motor vehicle safety inspection stop in this case did not violate defendant's constitutional rights or the principles of Delaware v. Prouse.
We agree with the trial judge that the criteria suggested in State v. Kirk, to find a roadblock constitutional, have probably been met in this case. We further agree that review of the site selected for the roadblock, considered important in the sobriety check point cases, is not possible when the roadblock is for the safety inspection of vehicles. As the trial judge found, the site *606 selected in this case was based upon the availability of a safe place off the side of the road to inspect the vehicles and a straightaway enabling oncoming traffic to observe the existence of the roadblock and to slow down in safety. Warning signs and cones as well as uniformed officers were used, as testified by Patrolman Mains.
We further conclude that the vehicles in this case were not "randomly" stopped at the "unbridled discretion of police officers" as constitutionally condemned in Delaware v. Prouse. The selection of the site and the method used for the roadblock were determined by the chief of police, the supervisory officer in command of the local police department. Vehicles were not stopped arbitrarily at the whim of the police officers but rather in accordance with a formula, i.e., every fifth vehicle and those vehicles with obvious defects or overdue inspection stickers. The latter categories included vehicles subject to being stopped anyway for violations of the Motor Vehicle Act.
Professor Lafave discusses the subject of sobriety checkpoints in 4 W.R. LaFave Search and Seizure § 10.8(d), at 69 (2d ed. 1987). In State v. Kirk, Judge King found an earlier edition of this discussion "the most comprehensive and thoughtful discussion" of the subject. In section 10.8(b), Professor LaFave finds that Delaware v. Prouse "intimates that a procedure for safety checks `of all oncoming traffic at road-block type stops' would be upheld because it does not `involve the unconstrained exercise of discretion.'" W.R. LaFave at 66.
In Maine, the Supreme Judicial Court has upheld as constitutional traffic safety roadblocks. See State v. Cloukey, 486 A.2d 143 (Me. 1985) (cited in State v. Kirk, 202 N.J. Super. at 48, 493 A.2d 1271); State v. McMahon, 557 A.2d 1324 (Me. 1989); State v. Patterson, 582 A.2d 1204 (Me. 1990). In finding safety check roadblocks reasonable, the Maine Court adopted the test set forth in Delaware v. Prouse:
The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its *607 promotion of legitimate governmental interests. [Patterson, 582 A.2d at 1205, citing Delaware v. Prouse, 440 U.S. at 654, 99 S.Ct. at 1396.]
The Maine Court in State v. Patterson, said, in performing this balancing test:
In weighing the gravity of the public concern served by a roadblock and the degree to which it advances the public interest, we examine "the societal interest in dealing with the issue effectively, the availability of less intrusive means to accomplish the objective and the efficacy of the method chosen." State v. Sherburne, 571 A.2d [1181] at 1184. [Me. 1990] Our cases have consistently emphasized that the State's vital interest in the health, safety, and welfare of its citizens justifies roadblocks designed to enforce motor vehicle safety laws and to prevent traffic accidents. See id. at 1188. The public is best served by a regime that deters drivers from traveling in unsafe vehicles and identifies safety defects before vehicles are involved in accidents. See State v. Cloukey, 486 A.2d at 146-147. We have never required the State to show conclusively that the means the police choose to check for unsafe vehicles is the best of all possible choices. See State v. McMahon, 557 A.2d at 1325-26. [Patterson, 582 A.2d at 1205-1206.]
In the Maine cases, it does not appear whether that State requires the annual inspection of vehicles as does the State of New Jersey and the State of Delaware as referred to in Delaware v. Prouse. However, the majority of the other states to have considered roadside safety checks have also found such checks constitutional. See Theresa Ludwig Kruk, Annotation, Validity of Routine Roadblocks by State or Local Police for Purpose of Discovery of Vehicular or Driving Violations, 37 A.L.R.4th 10 (1985).
It is the balancing of the intrusion on defendant's federal and state constitutional rights against the promotion of a legitimate governmental interest that attracts our attention in this case. Although the Law Division found the balance in favor of the governmental interest, the State presented no evidence to explain or support that interest. The judge reached his conclusion on the basis of the statutory authority contained in N.J.S.A. 39:8-2, which he found to be constitutional, without any discussion of the need for such roadside inspections.
Motor vehicles are required to be inspected by statute in the State of New Jersey. N.J.S.A. 39:8-1 provides:

*608 The director shall require every motor vehicle registered in this State which is used over the highways of this State, except vehicles and traction equipment registered pursuant to R.S. 39:3-24 and historic motor vehicles registered as such, to have such motor vehicles inspected by designated examiners or at official inspection stations to be designated by the director or at licensed private inspection centers. The director shall have the discretion to determine what motor vehicle equipment shall be subject to inspection under the provisions of this chapter.
Vehicles required by the Director to be inspected are required to be inspected at least annually. N.J.S.A. 39:8-2. Such inspections are conducted at public motor vehicle inspection stations, N.J.S.A. 39:8-2.2 or private inspection centers, N.J.S.A. 39:8-11. The Director of DMV has adopted administrative regulations for motor vehicle inspections. N.J.A.C. 13:20-7.1 to 7.13.
The trial judge relied upon the following paragraph in N.J.S.A. 39:8-2, which we quote again, as providing statutory authorization for random roadside vehicle examinations:
The director shall conduct random roadside examinations of motor vehicles required to be inspected in this State to provide a continuous monitoring of motor vehicles. Each year at least 1% of the total number of motor vehicles registered in the State shall be inspected by roadside examination teams under the supervision of the director.
This language was incorporated into N.J.S.A. 39:8-2 by the L. 1983, c. 236, § 3 at the same time annual inspections were legislatively mandated. The history of this legislation is somewhat confusing. We observe that notice of proposed rules on random inspections was first given to the Director of DMV on May 4, 1972 in 4 N.J.R. 105 and the Director, pursuant to the authority of N.J.S.A. 39:8-1 and 39:8-2, adopted the following rules for random inspections effective June 1, 1972, see 4 N.J.R. 165:

N.J.A.C. 13:20-29.1 Mobile Inspection Unit.
There is hereby created in the Bureau of Vehicle Inspection, to the Division of Motor Vehicles, a mobile inspection unit which is authorized to set up and conduct random roadside inspections of vehicles registered in New Jersey for the purpose of fostering highway safety.

N.J.A.C. 13:20-29.2 Procedures.

*609 (a) Vehicles inspected, pursuant to the authority of N.J.A.C. 13:20-29.1, which are found to be in safe operating condition will be allowed to proceed and no additional markings will be placed upon the vehicle.
(b) Vehicles inspected and found to be defective, in one or more ways, shall be marked with the same type of inspection sticker that they would receive had they been processed through a permanent inspection station maintained by this Division. These vehicles will be required to have the necessary repairs made and to return to any State-operated inspection station within the period of time indicated on the inspection sticker.

N.J.A.C. 13:20-29.3 Penalty
Vehicles found to be defective and so marked which continue to operate beyond the period provided for on the inspection sticker, shall be subject to the penalties now provided in Title 39 of the Statutes of New Jersey.
Thus, notwithstanding the absence of any specific statutory authority for "random roadside inspections" the director of DMV adopted regulations providing for such roadside inspections in 1972. It was not until 1983 that the Legislature adopted the statutory provision for such random roadside examinations now contained in N.J.S.A. 39:8-2 quoted above.
The question raised by this regulation and the language now contained in N.J.S.A. 39:8-2 is significant. As noted, the language in the statute was part of an amendment to N.J.S.A. 39:8-2 by the L. 1983, c. 236, § 3, which became effective June 30, 1983.
By the L. 1975, c. 156, § 3, the Legislature adopted N.J.S.A. 39:8-11, which originally provided as follows:
The director may, after appropriate inquiry and investigation, license to operate reinspection centers as many qualified and properly equipped persons engaged in the business of motor vehicle repairs and service as are necessary, to certify that the specific items for which a vehicle was initially rejected at a motor vehicle inspection station have been adjusted, corrected or repaired by him or under his direction, and that the condition of said items conforms to the standards established by law or regulation. Such certification shall be evidenced by a reinspection approval sticker placed on the vehicle as prescribed by the director.
Chapter 236 of the Laws of 1983 declared its intent to provide sufficient resources for the DMV to implement for one year a motor vehicle inspection system utilizing reinspection centers licensed pursuant to N.J.S.A. 39:8-11 to conduct initial inspections while remaining prepared to return to a completely state-operated *610 system after the one-year period, unless the Legislature determined to continue to authorize the motor vehicle inspection system established by this act. Included within that legislation is the amendment of N.J.S. 39:8-2 to provide for random roadside examinations.
By the L. 1986, c. 22, licensed private inspection centers were made permanent and N.J.S.A. 39:8-11 was appropriately amended. The statement to Assembly Bill 2218, which became Chapter 22 of the Laws of 1986, includes the following language:
The roadside inspection program which permits continuous monitoring of vehicles is continued. Roadside inspections would also serve to check vehicles that are inspected by private inspection centers. [Committee Statement of March 6, 1986]
The Committee Statement of May 19, 1986 contains the following language:
The dual inspection system has resulted in several advantages to the citizens of New Jersey. By giving vehicle owners the flexibility of having their vehicles inspected at State centers or private inspection centers, the dual inspection system has helped to reduce the waiting times at State inspection centers and has permitted vehicle owners to combine their vehicle's inspection and visits to a private garage for routine maintenance. The dual inspection system also has allowed New Jersey to fulfill the terms of its agreement with the federal Environmental Protection Administration to inspect vehicles annually for emissions while at the same time increasing the number of vehicles that are required to be inspected.
Under this bill, systems for overseeing the integrity of the dual inspection program will remain in effect. The roadside inspection program, which permits the monitoring of vehicles for conformance with inspection standards and the monitoring of private inspection stations for the quality and thoroughness of their inspections, will continue. Penalties for affixing a private inspection approval sticker without first determining that the vehicle meets the standards established by law remain the same. [emphasis added]
It thus appears that random roadside inspections began in 1972 by the Director's promulgation of N.J.A.C. 13:20-29.1. Thereafter, in 1983 the Legislature specifically authorized such random roadside examinations by the amendment to N.J.S.A. 39:8-2. The temporary initial inspection of vehicles by licensed private inspection centers was made permanent in 1986. From the Assembly statement attached to that legislation it appears *611 that at least one of the reasons for continuing the roadside inspection program was to check vehicles inspected by private inspection centers for the quality and thoroughness of their inspections.
The initial authorization for random roadside inspections by regulation promulgated by the director of DMV preceded the Supreme Court's decision in Delaware v. Prouse. However, the statutory authorization for such random roadside examinations adopted by the Legislature in 1983 came after the Prouse decision. The trial judge found that legislation to be constitutional by suggesting that the Legislature permitted the Director of DMV to conduct random roadside examinations so long as they are conducted under the guidelines of the case law, including Delaware v. Prouse. The difficulty, as the trial judge noted, is that the Director has not promulgated any regulations or guidelines pursuant to the case law, or Delaware v. Prouse.
Defendant concedes that to afford him relief, the provisions of N.J.S.A. 39:8-2 concerning random roadside examinations must be declared unconstitutional, at least as applied to him. Notwithstanding this contention, the defendant has failed to provide notice to the Attorney General as required by R. 2:5-1(h). In this case, the State was represented in the Municipal court by the local prosecutor. On the appeal before the Law Division the State was represented by "David Gornberg" whose official title is not indicated in the transcript.[3] However, at that proceeding Larry Holtz, who identified himself as an assistant Burlington County prosecutor, asked the court to construe R. 3:24(d) which provides:
On appeal by the State from the grant of a motion to suppress the matter shall be tried de novo on the record. In cases in which the Attorney General or county prosecutor did not appear in the Municipal court, the State shall be permitted to supplement the record and to present any evidence or testimony concerning the legality of the contested search and seizure. The defendant *612 shall be permitted to offer related evidence in opposition to the supplementary evidence offered by the State.
The prosecutor recognized that the motion to suppress had been denied in the Municipal court but suggested that where the case comes up on appeal, even when the motion was denied, the State should be permitted to supplement the record by bringing in witnesses to supply information that "your Honor is looking for." The defendant objected and the judge stated he would consider both positions. However, in his written opinion, the judge did not rule on this issue, probably because he decided to affirm the denial of the motion to suppress.
As noted, the only evidence submitted by the State before the Municipal court was the testimony of Patrolman Mains who was really unsure of the procedure leading up to the roadblock. No evidence was offered in support of the reasons for random roadside inspections except for the existence of legislative authority. Further, no empirical data was submitted to assist in examining the balance between the intrusion on individual rights against the promotion of some legitimate governmental interest; for example, the frequency of vehicles which have passed inspection at a state facility but have been found, on roadside inspection, to have developed defects; or vehicles which have passed inspection at a private facility notwithstanding defects found on roadside inspections.
As Justice White concluded in Prouse,
An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive and often necessary mode of transportation to and from one's home, work place and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As Terry v. Ohio, [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889] supra, recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those *613 interests when they step from the sidewalks into their automobiles. [Prouse, 440 U.S. at 662-663, 99 S.Ct. at 1400-1401.]
Later, in Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), Chief Justice Burger said,
A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. [citations omitted] To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. [citations omitted] [Id., 443 U.S. at 51, 99 S.Ct. at 2640.]
We recognize that the burden was upon the State to establish the governmental interests which were of sufficient importance to warrant the intrusion upon the travelling public's federal and state constitutional rights to be free of warrantless seizures. The State did not offer such evidence except for the statute. However, because of the defendant's failure to give notice of his attack upon the constitutionality of the statute authorizing such random roadside examinations, the Attorney General did not participate before the Municipal Court, the Law Division nor this court to defend the statute's constitutionality. The Assistant Prosecutor did suggest before the Law Division his desire to present further evidence to respond to the questions raised by the judge. For example, the judge asked:
THE COURT: But the State does have already in place a very, very comprehensive program or inspection program for these kinds of minor safety violations, the inspection program to wit, either the public program at a motor vehicle inspection station or the private station where you can go pay fifteen bucks to get your car inspected. Isn't that sufficient to protect the State's interest in these minor violations? Why do we have to have a roving patrol to go around through all the counties and highways and byways and inconvenience people with a road block to ferret them out when you have this other system already erected?
The judge was apparently satisfied with Mr. Gornberg's response.
We recognize that highway safety is certainly a matter of extreme importance to the public and may warrant this minimal intrusion upon the travelling public's right to be let alone. On *614 the other hand, we can envision a motorist who has just had his vehicle inspected after a long wait, with the current inspection sticker displayed on its windshield, on his way to an important appointment, not displaying any evidence of any equipment violations and being stopped simply because he is the fifth car in a line of traffic. Should he be subjected to this intrusion upon his reasonable expectation of privacy, as observed by Justice White in Prouse? We conclude that the record in this case is insufficient to properly address this important issue and therefore reverse the determination of the Law Division and remand the matter to that court for reconsideration. On the remand we direct that notice be given to the Attorney General of defendant's claim that N.J.S.A. 39:8-2 is unconstitutional in so far as it authorizes random roadside examinations of motor vehicles. The State shall be permitted to supplement the record with appropriate evidence.
Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] The description of the roadside safety check is taken from the testimony of Patrolman Steve Mains, the only witness presented by the State. Patrolman Mains testified that he was not really sure but he believed the police department requested the roadside inspection.
[2] His breathalyzer readings were .22 and .21 respectively.
[3] We do not find Mr. Gornberg's name listed in the Lawyer's Diary. On this appeal, the State is represented by the Burlington County Prosecutor.